**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMIE KIRKPATRICK, individually, and as the natural father and legal guardian of B.W., a minor, *Plaintiff-Appellant*, | No. 12-15080 |
| | D.C. No. 3:09-cv-00600-ECR-VPC |
| v. | |
| COUNTY OF WASHOE; AMY REYNOLDS, WCDSS social worker; ELLEN WILCOX, WCDSS social worker; LINDA KENNEDY, WCDSS social worker, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Jr., Senior District Judge, Presiding

Argued and Submitted
January 28, 2014—University of Nevada, Las Vegas

Filed July 10, 2015

Before: Stephen Reinhardt, Alex Kozinski,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Partial Dissent by Judge Kozinski

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of defendants and remanded in a 42 U.S.C. § 1983 action against the County of Washoe and three social workers alleging violations of the Fourth and Fourteenth Amendment when defendants took plaintiff's biological daughter, B.W., into protective custody when she was two days old and placed her with a foster parent without obtaining prior judicial authorization.

The panel affirmed the district court's summary judgment in favor of all of the defendants on the Fourteenth Amendment claim alleged by plaintiff on his own behalf. The panel held that plaintiff did not have a constitutionally recognized liberty interest in his relationship with B.W. when she was taken into custody because his paternity was not yet established.

The panel reversed the district court's summary judgment in favor of two social workers and Washoe County on the claim that they violated B.W.'s Fourth Amendment right to be free from unreasonable seizures. The panel concluded that the district court erred in deciding that the complaint did not provide adequate notice that B.W. asserted a Fourth Amendment claim on her own behalf. The panel further concluded that the social workers seized B.W. without obtaining a warrant under circumstances where a reasonable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

juror might find that a reasonable social worker could not have determined that the child was in imminent danger of serious bodily injury. The panel determined that the social workers were not entitled to qualified immunity on B.W.'s Fourth Amendment claim.

The panel held that the evidence presented at least an inference of an unconstitutional, unofficial custom in Washoe County of taking custody of children under non-exigent circumstances, without obtaining prior judicial authorization. The County therefore was not entitled to summary judgment. The panel remanded for further proceedings on the Fourth Amendment claim filed on behalf of B.W. against these three defendants.

The panel affirmed the district court's summary judgment in favor of social worker Amy Reynolds with respect to all claims because the plaintiffs had not alleged any facts suggesting that she was involved with the decision to take custody of B.W.

Dissenting in part, Judge Kozinski stated that the majority ignored the Supreme Court's clear admonition that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Judge Kozinski stated that the majority imposed personal liability on two child protective service workers whose actions were anything but malicious or incompetent.

**COUNSEL**

David J. Beauvais (argued), Oakland, California; William R. Kendall, Reno, Nevada; Jeffrey Friedman, Reno, Nevada, for Plaintiffs-Appellants.

Brian M. Brown (argued) and Kevin A. Pick, Thorndal, Armstrong, Delk, Balkenbush & Eisinger, Reno Nevada, for Defendants-Appellees Amy Reynolds, Ellen Wilcox, and Linda Kennedy.

Herbert B. Kaplan (argued), Deputy District Attorney; Richard Gammick, District Attorney, Reno, Nevada, for Defendant-Appellee Washoe County.

**OPINION**

BYBEE, Circuit Judge:

"Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 1999)). The Washoe County Department of Social Services (WCDSS) took B.W. into protective custody when she was two-days old and placed her with a foster parent without obtaining prior judicial authorization. B.W.'s biological father, Jamie Kirkpatrick, filed this 42 U.S.C. § 1983 action

against the County and three of its social workers, alleging violations of the Fourth and Fourteenth Amendments. The district court granted summary judgment in favor of all of the defendants. We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's order granting summary judgment. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).

We affirm in part and reverse in part the district court's grant of summary judgment and remand for further proceedings.

I

A. *The County Takes Custody of B.W.*

On July 15, 2008, Rachel Whitworth gave birth to her daughter B.W. at a hospital in Reno, Nevada. Whitworth admitted that she used methamphetamine throughout her pregnancy, including as recently as two days earlier. B.W. tested positive for methamphetamine at birth. When Whitworth informed hospital staff that her two other children were in the custody of the WCDSS, the hospital contacted Chondra Ithurralde, the WCDSS social worker managing the open case.

The next day, Ithurralde visited the hospital with WCDSS social worker Ellen Wilcox. Ithurralde notified the hospital that Whitworth was an active methamphetamine user who lacked stable housing and the supplies necessary to care for an infant and that the Department planned to terminate her parental rights vis-à-vis her two other children. Wilcox interviewed Whitworth, who again acknowledged that she was a methamphetamine user who did not have the means to

provide for B.W.   In light of this information, Wilcox requested that the hospital place a "hold" on B.W. to prevent her from being discharged.  The hospital typically honors the Department's hold request as a courtesy, but it is not a court order.  The hold did not prevent Whitworth from interacting with B.W. while they were in the hospital together.  The hospital's notes state that B.W. remained in the room with Whitworth, who failed to feed the infant on schedule and keep her dry.   Meanwhile, Wilcox conferred with her supervisor Linda Kennedy, who authorized Wilcox to take custody of B.W. when the hospital released the infant. Wilcox informed Whitworth that she had placed a hold on the child and that a protective custody hearing would be scheduled.

On July 17, 2008, the hospital discharged two-day-old B.W. into the custody of the WCDSS.  The Department arranged for B.W. to stay with the foster parent who was caring for Whitworth's other children.  The WCDSS had not requested judicial authorization before taking custody of B.W.

The family division of Nevada's Second Judicial District Court held a protective custody hearing the next day, with Whitworth participating by phone from the hospital.  The court determined that B.W. should remain in protective custody due to Whitworth's ongoing drug use, her lack of stable housing and employment, her inability to provide for the child, and the fact that Whitworth's other children were already in foster care.

B. *Kirkpatrick's Involvement*

Jamie Kirkpatrick, B.W.'s biological father, was present at the hospital when Whitworth gave birth to B.W. While Whitworth was pregnant, she notified Kirkpatrick that he might be the father, though she also told him that there were other potential candidates. Kirkpatrick spoke with Whitworth a couple of times during her pregnancy, but he did not participate in providing any type of prenatal care. He acknowledged that he did not know whether he was B.W.'s biological father at the time of her birth.

Kirkpatrick first learned of the Department's involvement soon after it took custody of the child on July 17, 2008. He left his contact information with Whitworth so that the Department could schedule a paternity test to determine whether he was B.W.'s biological father. Kirkpatrick did not attend the protective custody hearing the next day, but the court ordered a paternity test at his request. The test revealed that Kirkpatrick is indeed B.W.'s biological father.

On July 28, 2008, the WCDSS filed a petition alleging that B.W. was a child in need of protection. The court held hearings on August 25, 2008, and September 15, 2008. Neither Whitworth nor Kirkpatrick attended despite being served with notice. Kirkpatrick visited B.W. twice before January 2009, when he attended a six-month permanency hearing and expressed interest in reunifying with his daughter. He returned to Reno—where B.W. lived with her foster family—and began visiting his child more frequently.

In October 2009, Kirkpatrick initiated this § 1983 action against Washoe County, Amy Reynolds, Ellen Wilcox, and Linda Kennedy. Following discovery, the parties filed cross-

motions for summary judgment. The district court denied Kirkpatrick's motion for summary judgment and granted summary judgment in favor of Washoe County and the three individual defendants. Kirkpatrick timely appealed.

## II

The state's decision to take custody of a child implicates the constitutional rights of the parent and the child under the Fourteenth and Fourth Amendments, respectively. "Parents and children have a well-elaborated constitutional right to live together without governmental interference. That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Wallis*, 202 F.3d at 1136 (internal citations omitted). "The claims of the parents in this regard should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association." *Id.* at 1137 n.8. But "[b]ecause only the children [a]re subjected to a seizure, their claims should properly be assessed under the Fourth Amendment." *Id.* Parents cannot assert that the seizure of their child violated their *own* Fourth Amendment rights. *Mabe*, 237 F.3d at 1111 ("[The parent] has no standing to claim a violation of [the child's] Fourth Amendment rights.").

We evaluate the claims of children who are taken into state custody under the Fourth Amendment right to be free from unreasonable seizures rather than the Fourteenth Amendment right to familial association "[b]ecause [when] the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the

more generalized notion of 'substantive due process,' must be the guide." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2011) ("For child removal claims brought by the child, we have concluded that the Constitution provides an alternative, more specific source of protection than substantive due process. When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes. The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'"); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011) ("[S]ubstantive due process may not be called upon when a specific constitutional provision (here, the Fourth Amendment) protects the right allegedly infringed upon. . . . [The child's] claim arising from his initial removal is properly analyzed under the Fourth Amendment because it is premised on his seizure and does not coincide with sufficiently separate conduct involving his relationship with his parents." (first alteration in original) (internal quotation marks and citations omitted)).

## III

### A. *Kirkpatrick's Fourteenth Amendment Claim*

We first consider whether the district court correctly granted the defendants' motion for summary judgment on Kirkpatrick's claim that the County and its agents violated his Fourteenth Amendment right not to be separated from B.W. without due process under non-exigent circumstances. *See Mabe*, 237 F.3d at 1106; *Wallis*, 202 F.3d at 1136. We affirm the district court's summary judgment in favor of all of the defendants on Kirkpatrick's claim because the facts alleged, construed in the light most favorable to Kirkpatrick, do not

show that the defendants violated his constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries.").

Kirkpatrick did not have a constitutionally recognized liberty interest in his relationship with B.W. when she was taken into custody on July 17, 2008, because he was not yet a "parent" to B.W. At the time, no one was confident about whether Kirkpatrick was B.W.'s biological father. Kirkpatrick acknowledged that he "did not know" whether he was the father and that there were "possibly other candidates." Rachel Whitworth had informed Kirkpatrick that B.W. might be his child, but that there was "a possibility it could be someone else's as well." The test that eventually established Kirkpatrick's paternity was not administered until four days after B.W. was taken into custody.

We have recognized that the constitutional interest in a biological parent's relationship with his child persists even when that relationship is, as a practical matter, quite attenuated. *See Burke v. Cnty. of Alameda*, 586 F.3d 725, 733 (9th Cir. 2009) (holding that a biological father had a liberty interest in his relationship with his daughter even though the child's mother had sole physical custody of the child); *Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006) (holding that "non-custodial parents with court-ordered visitation rights have a liberty interest in the companionship, care, custody, and management of their children"). But Kirkpatrick did not take any steps to confirm that he was B.W.'s biological father before the WCDSS took custody of B.W., such as requesting a paternity test before she was born or during her two days in the hospital, or attempting to

execute a voluntary acknowledgment of paternity declaration. *See* Nev. Rev. Stat. § 126.053 (providing that a voluntary acknowledgment of paternity declaration is "deemed to have the same effect as a judgment or order of a court determining the existence of the relationship of parent and child if the declaration is signed . . . by the mother and father of the child"). Of course Kirkpatrick was not obligated to attempt to confirm his paternity, but he cannot claim the constitutional entitlements that have been allocated to biological parents when he did not seek to establish that he was B.W.'s father.

On these facts, we conclude that Kirkpatrick lacked a cognizable liberty interest in his relationship with B.W. Because Kirkpatrick cannot prove a violation of his constitutional rights, the district court properly granted summary judgment in favor of all of the defendants on the claim asserted by Kirkpatrick on his own behalf.

## B. *B.W.'s Fourth Amendment Claim*

We next consider whether the defendants violated B.W.'s Fourth Amendment right to be free from unreasonable seizures when she was taken into custody by the WCDSS.

### 1.  Adequate notice

The district court granted summary judgment in favor of the defendants because it concluded that the operative complaint—which is styled the second amended complaint—does not assert a cause of action *on behalf of* B.W. The court noted that the complaint repeatedly refers to the "Plaintiff" in the singular, including in the caption. Only once, the district court observed, does the complaint allege that "[B.W.'s]

constitutional right to be with her parents was violated." The court reasoned that the complaint fails to articulate a claim *on behalf of* B.W. because "[r]ead in the context of the entire complaint, this one sentence does not provide notice that B.W. is a plaintiff to this case or that [Kirkpatrick] is asserting a cause of action on her behalf." Furthermore, the complaint's sole reference to the Fourth Amendment is located in a paragraph asserting that the defendants "acted under color of state law to deprive Plaintiff . . . of constitutionally protected rights, including . . . the right to be free from unreasonable searches and seizures." The district court inferred that the singular "Plaintiff" refers to Kirkpatrick, not B.W., and, under these circumstances, a parent cannot claim relief on the grounds that the state violated his own Fourth Amendment rights by seizing his child. *See Mabe*, 237 F.3d at 1111.

The district court did not appear to disagree with the premise that a parent is authorized to assert causes of action belonging to his minor child *on behalf of the child*. *See* Fed. R. Civ. P. 17(c)(2) ("A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."); Fed. R. Civ. P. 17(b)(3) ("Capacity to sue or be sued is determined . . . by the law of the individual's domicile."); Nev. Rev. Stat. § 12.080 ("[T]he father or the mother, without preference to either, may maintain an action for the injury of a minor child who has not been emancipated, if the injury is caused by the wrongful act or neglect of another."). Instead, the court determined that the complaint simply failed to "provide notice to the Defendants or the Court that B.W. is also a plaintiff in this case, or that Plaintiff is asserting a cause of action on her behalf." We respectfully disagree with the district court's reading of the complaint.

The operative complaint recites that "[B.W.'s] constitutional right to be with her parents was violated. This also resulted in the violation of Plaintiff's constitutional right to be with his daughter." These sentences indicate that the complaint alleges claims on behalf of *both* B.W. and Kirkpatrick. A pleading need not repeat the same assertion more than once to provide notice. We understand that the defendants or the court might have been confused to encounter this pair of claims given that the rest of the complaint refers to a singular "Plaintiff." But defendants can resolve such ambiguities by filing a Rule 12(e) motion for a more definite statement. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."); *see also Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (encouraging district courts to "grant the defendant's motion for a more definite statement under Rule 12(e)" where, as here, discovery in an action against a public official would undermine "the substance of the qualified immunity defense"). The district court may also *sua sponte* request a more definite statement from the plaintiffs, even if the defendants find the complaint comprehensible. *See Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 n.5 (11th Cir. 1996) ("[T]he court, acting *sua sponte*, should have struck the plaintiff's complaint, and the defendants' answer, and instructed plaintiff's counsel to file a more definite statement.").

The district court correctly observed that the complaint never expressly states that *B.W.* asserts that the defendants violated *her* Fourth Amendment right to be free from unreasonable seizures. When evaluating a complaint, we ask

whether the pleading gives the defendant fair notice of the claim and includes sufficient "factual matter" to state a plausible ground for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 561–62 (2007). To be clear, the question here is not whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Rather, the question is whether the complaint gave "notice of the claim such that the opposing party may defend himself or herself effectively." *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011).[1] "[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011); *see also Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001) ("Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief."). The complaint is therefore not inadequate merely because the assertion that

---

[1] Although this case is not about pleading standards per se, in order to review the district court's summary judgment order we must decide whether the complaint gave the defendants notice of the claims against them, as if we were reviewing an order granting a motion to dismiss. We have analyzed whether a complaint provides adequate notice through the lens of Rule 8(a)(2) even when the question arises at the summary-judgment stage. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (evaluating "whether [the] plaintiff's complaint complied with the notice pleading requirements of Fed. R. Civ. P. 8" where the district court granted summary judgment on the basis that the complaint failed to give the defendant "adequate notice" of particular claims).

"[B.W.'s] constitutional right to be with her parents was violated" is not coupled with a reference of the Fourth Amendment.  The complaint recites the relevant legal standard by stating that the defendants took B.W. into custody without a warrant when they "had no reasonable cause to believe that [B.W.] was likely to experience serious bodily harm in the time that would be required to obtain a warrant."

We need not speculate about whether the complaint provided notice of the Fourth Amendment claim sufficient to allow the defendants to defend against it because the defendants themselves construed the complaint as asserting a Fourth Amendment claim *on behalf of B.W.*  In their motion to dismiss, the defendants stated that "[w]hile the Second Amended Complaint indicates the Plaintiff as 'Jamie Kirkpatrick, individually and as the natural father and legal guardian of [B.W.], a minor', it is believed that the action is intended in pursuit of only causes of action on behalf of the minor child."  In their motion for summary judgment, the individual defendants correctly pointed out that "Mr. Kirkpatrick can only assert a violation of [B.W.'s] Fourth Amendment rights, as a representative, on behalf of his daughter."  The individual defendants then devoted seven pages to arguing that they were entitled to summary judgment on the "Plaintiffs' representative Fourth Amendment claim." We cannot agree with the district court's assessment that "the operative complaint . . . does not provide notice to the Defendants or the Court that B.W. is also a plaintiff in this case" when the entire litigation proceeded in accordance with the defendants' acknowledgment that B.W. is a plaintiff and that Kirkpatrick is asserting a Fourth Amendment claim on B.W.'s behalf.

We by no means require defendants to adopt overly broad readings of ambiguous or incoherent complaints out of an abundance of caution.  The defendants could have moved to dismiss the Fourth Amendment claim on the basis that the complaint purports to assert the claim on behalf of Kirkpatrick rather than assuming that it stated a facially valid claim on behalf of B.W.  Or, as we have already noted, either the defendants or the court could have insisted on a more definite statement at the pleading stage.  If the plaintiffs continued to assert a facially invalid claim after amending their complaint in response to a motion to dismiss or a motion for a more definite statement pointing out the defect in the pleading, then the district court could have taken the complaint at its word and dismissed the claim with prejudice. But that is not what happened in this case.  Instead, the court raised the issue *sua sponte* for the first time at the summary-judgment stage, even though the defendants actually understood the claim, repeatedly addressed it on the merits, and could have clarified it earlier in the litigation.

We conclude that the district court erred in deciding that the complaint did not provide adequate notice that B.W. asserted a Fourth Amendment claim on her own behalf.  The defendants are not entitled to summary judgment on this basis.

2.  Qualified immunity

Having determined that the operative complaint asserts a violation of B.W.'s Fourth Amendment right to be free from unreasonable seizures, we next address whether the individual defendants are entitled to qualified immunity on B.W.'s claim. *See United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1144 (9th Cir. 2004) ("We

may affirm a grant of summary judgment on any ground supported by the record, even if not relied upon by the district court."). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

### a. Constitutional right

"Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Mabe*, 237 F.3d at 1106 (quoting *Wallis*, 202 F.3d at 1138). There are thus two ways for a government official to take custody of a child without transgressing the Constitution. First, he can obtain prior judicial authorization. Or, second, he can take custody of the child without a warrant if he "possess[es] information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.* (internal quotation marks and citation omitted).

The defendants did not attempt to obtain judicial authorization before taking custody of B.W. Ellen Wilcox—who visited B.W. at the hospital and took her into the Department's custody—stated that neither she nor anyone else from the WCDSS requested a warrant. Linda Kennedy—who authorized the decision to take custody of

B.W. in her role as Wilcox's supervisor—agreed that she would not have requested a warrant under these circumstances.

The decision to take custody of B.W. was therefore permissible only if the defendants "possess[ed] information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Id*. (internal quotation marks and citation omitted). "The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury. Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated." *Wallis*, 202 F.3d at 1138 (internal citations omitted).

It is undisputed that B.W. remained in the hospital between the social workers' first visit on July 16, 2008, and her discharge into the Department's custody the next day. Kennedy acknowledged that the WCDSS considered the maternity floor of the hospital a "safe environment." She noted that a mother in Rachel's position might unexpectedly abscond with her child, but she also stated that the hospital "generally cooperates" with the Department's request that it hold the child.

Importantly, "social workers[] who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant*." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (emphasis added); *see also Doe v. Lebbos*, 348 F.3d 820, 826 n.9 (9th Cir. 2003), *overruled on other grounds by*

*Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 909 (9th Cir. 2008) (en banc)); *Wallis*, 202 F.3d at 1137 n.8 (explaining that the claims of children who are taken into custody without a warrant under non-exigent circumstances "should properly be assessed under the Fourth Amendment" because "the children were subjected to a seizure"). In *Rogers*, we concluded that a social worker did not have reasonable cause to believe that the children at issue were in imminent danger of serious bodily injury even though they showed symptoms of neglect and would have remained in an unsanitary home while the social worker obtained a warrant. *Id.* at 1295–96. Here, B.W. would have very likely remained in the hospital, under constant medical supervision, while the defendants requested a warrant because the hospital was not planning on releasing B.W. to her mother or anyone other than the WCDSS. Viewing the facts in the light most favorable to the plaintiff, we think a reasonable juror could find that Wilcox and Kennedy could not have reasonably believed that B.W. would "likely experience serious bodily harm" during the time it would have taken to obtain a warrant. For reasons we have discussed, the defendants' actions implicate B.W.'s Fourth Amendment right to be free from unreasonable seizures.

Our analysis is unaffected by the fact that B.W. was only two days old and had yet to leave the hospital when the WCDSS took custody of her. The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable . . . seizures." It does not make exceptions based on age, mobility, or the capacity to understand the state's actions. The minor plaintiffs in *Wallis* were two years old and five years old when they were taken into custody. *Wallis*, 202 F.3d at 1131. A two-year old child—like a two-day old infant—is under the near-constant control of adults

and probably cannot meaningfully comprehend the notion of being "seized" by the state. Yet we held that the children in *Wallis* were "subjected to a seizure" and analyzed their claims under the Fourth Amendment. *Id.* at 1137 n.8.

Other courts have applied the same Fourth Amendment analysis to newborn children like B.W. In *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000), a hospital held an infant for the first ten days of her life because it believed that the child's mother used harmful drugs while pregnant. *Id.* at 751. The court held that "there is no doubt that [the child's] retention by the Hospital was a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 762. It recited the familiar standard that "[a] 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). The court acknowledged that "the usual phrasing of the seizure test is difficult to apply" under these circumstances because an infant "is unlikely to have had a 'belief' as to whether or not she was free to leave." *Id.* at 762. But the court nevertheless concluded that the child was seized because her mother "was told in no uncertain terms that she could not take [the child] home" and "[i]t was clear to [the mother], if not to [the child], that [the child] was not free to leave." *Id.* In other words, a child's ability to subjectively understand that she has been "seized" is not a prerequisite to the application of the Fourth Amendment. As the Supreme Court explained, "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621,

628 (1991). Here, the WCDSS physically removed B.W. from the hospital and placed her with a foster family rather than permitting her to leave with her mother. Physically restraining a person and directing her movement is a prototypical example of a "seizure" that implicates the Fourth Amendment. *Id.* at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement.").[2]

Wilcox and Kennedy seized B.W. without obtaining a warrant under circumstances where a reasonable juror might find that a reasonable social worker could not have determined that the child was in imminent danger of serious bodily injury. We therefore conclude that the plaintiffs have satisfied the first prong of the qualified immunity inquiry because, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201.

   b.   Clearly established

We next address whether the constitutional right at issue "was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 131 S. Ct. at 2080. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"

---

[2] Because the WCDSS eventually seized B.W. by taking physical custody of her and placing her with a foster family, we need not consider whether B.W. was "seized" during the period when she remained in the hospital subject to the Department's hold request.

*Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Our inquiry begins and ends with our decision in *Rogers*. Not only is *Rogers* almost "directly on point," but it also plainly holds that the constitutional right at issue in this case is "clearly established." Our opinion in *Rogers* explained that "[t]he law was clearly established at the time of the events in [*Rogers*] that a child could not be removed from the home without prior judicial authorization absent evidence of 'imminent danger of serious bodily injury and [unless] the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Rogers*, 487 F.3d at 1297 (third alternation in original) (quoting *Mabe*, 237 F.3d at 1106). The conduct reviewed in *Rogers* occurred in 2001, and we issued our opinion in 2007. The WCDSS did not take custody of B.W. until 2008. The alleged violation of B.W.'s Fourth Amendment rights thus occurred after the relevant constitutional rule was clearly established *and* after we expressly held that the right is clearly established.[3]

---

[3] Once we have issued an opinion on point—here, *Rogers*—we mean business, and all officials must abide by that instruction. Judge Kozinski argues that "*Rogers* alone cannot have placed *every* reasonable official on notice that taking B.W. into custody was unconstitutional." Dissent at 40. We disagree. Where a single case "'has clear applicability' to a subsequent set of facts," that case alone is sufficient to put law enforcement officials on notice. *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 742 (2002)) ("*Hope* specifically states that a right is clearly established . . . when the 'premise' of one case 'has clear applicability' to a subsequent set of facts."); *cf. Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013) (holding that a

The case before us is not distinguishable from *Rogers*. It is true that *Rogers*—like *Mabe* and *Wallis*—refers to a qualified prohibition on removing children "from the home" whereas, here, the WCDSS took custody of B.W. while she was in the hospital. *See Rogers*, 487 F.3d at 1294; *Mabe*, 237 F.3d at 1107; *Wallis*, 202 F.3d at 1136. But we do not think that any reasonable social worker would read *Rogers* or its predecessors to stand for the proposition that the constitutional limitations on the seizure of children apply only when the children are at home. *See Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (emphasis added) (internal citation omitted)). The fact that B.W. was in the hospital arguably should have made it more apparent to a reasonable social worker that she was not "likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers*, 487 F.3d at 1294. In *Rogers*, we concluded that "there was no indication of imminent danger" to the seized children even though they would have remained in an "unsanitary" home with allegedly neglectful parents while the social worker obtained a warrant. *Id.* at 1295. Here, B.W. almost certainly would have remained in the hospital, where there is likely less "imminent risk of serious bodily harm" than in the conditions endured by the children in *Rogers*.

---

right was not clearly established where the plaintiff failed to provide "a single case citation to support" that notion).

We also note that B.W. was a two-day old infant when she was taken into custody by the WCDSS, whereas the children in *Rogers* were three-years old and five-years old. *Id.* at 1291. Age is often crucial in determining whether a social worker could have reasonably believed that the child was in imminent danger of serious bodily injury because a two-day old infant like B.W. is far more vulnerable than an older child. But no reasonable social worker could read *Rogers* and its predecessors to suggest that it is always reasonable to conclude that an infant is in imminent danger of serious bodily injury. Although infants are uniquely susceptible to serious injury, the maternity ward of a hospital is an especially safe place, particularly where, as here, the hospital has been instructed not to discharge the infant without notifying the social workers.

The defendants contend that they could have reasonably believed that Nevada law authorized the WCDSS to take custody of B.W. without obtaining a warrant. They cite Nev. Rev. Stat. § 432B.390(1)(a), which provides that social workers "[m]ay place a child in protective custody without the consent of the person responsible for the child's welfare if the [social worker] has reasonable cause to believe that immediate action is necessary to protect the child from injury, abuse or neglect." There is no indication that the state-law standard differs meaningfully from the constitutional rule that social workers may take custody of a child without prior judicial authorization if there is "reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Wallis*, 202 F.3d at 1138. Nev. Rev. Stat. § 432B.390(1)(a) does *not* authorize social workers to take custody of children under non-exigent circumstances. It says nothing at all about when, if ever, a social worker may take custody of a child when he does not have "reasonable cause to believe that

immediate action is necessary to protect the child from injury, abuse or neglect." We are not confronted with a situation where an applicable state statute is in tension with the federal constitutional right on which the plaintiffs rely. *See Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999) (explaining that "it was reasonable for [the defendant] to believe that [a state statute] was constitutional and to enforce its mandates" when "there was no clear case law in either the federal courts or the state courts of California establishing that" the practice authorized by the state statute was unconstitutional); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("[W]here a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional.").[4]

Next, the defendants argue that they are entitled to qualified immunity because they were not informed of the need to obtain a warrant before taking custody of a child under non-exigent circumstances. Kennedy—who was a supervisor—stated that when the WCDSS took B.W. into custody in July 2008 she did not understand the distinction between removing a child with a warrant and doing so

---

[4] The plaintiffs do not challenge the constitutionality of Nev. Rev. Stat. § 432B.390(1)(a). We express no view on whether the phrase "reasonable cause to believe that immediate action is necessary to protect the child from injury, abuse or neglect" in the state statute is broader than the phrase "reasonable cause to believe that the child is in imminent danger of serious bodily injury" in our cases. Even assuming *arguendo* that there might be a case where a social worker would consider the warrantless seizure of a child justified under the state standard but not under the federal standard, we do not think that any reasonable social worker could have concluded that either standard was satisfied in this case.

without a warrant. She explained that it was not her "general practice" to obtain a warrant unless there were "special circumstances" such as a "suspected kidnapping or something like that." Wilcox said that, as of July 2008, she had not been trained in how to obtain a warrant. She was aware that other social workers received warrants before taking custody of children under certain circumstances, but she did not recall any specific instances where the practice had occurred and had never obtained a warrant herself. The defendants' argument is unavailing because "[i]f the law was clearly established, the immunity defense ordinarily should fail, since *a reasonably competent public official should know the law governing his conduct.*" *Harlow v. Fitzgerald*, 457 U.S. 800, 819–20 (1982) (emphasis added); *see also Groh v. Ramirez*, 540 U.S. 551, 563–64 (2004); *Crawford-El*, 523 U.S. at 591. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (internal citations omitted) (quoting *Harlow*, 457 U.S. at 818–19). The reasonableness of the defendants' conduct must therefore be assessed in light of the clearly established law that social workers must obtain a warrant before taking custody of a child under non-exigent circumstances, and not in light of their own subjective beliefs about the law. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) ("The relevant inquiry under this second prong [of the qualified-immunity analysis] is wholly objective; an official's subjective belief as to the lawfulness of his conduct is irrelevant." (citing *Anderson*, 483 U.S. at 641)).

We conclude that Wilcox and Kennedy are not entitled to qualified immunity on B.W.'s Fourth Amendment claim, and

reverse the district court's summary judgment.**[5]**  We think that a reasonable juror might find that a reasonable social worker could not have determined that B.W. would be in imminent danger of serious bodily injury in the time that it would have taken to obtain a warrant.  Because a genuine dispute of material fact exists, we remand this issue for trial. *See Mabe*, 237 F.3d at 1108–09, 1112.

### 3.  Municipal liability

The final issue before us is whether Washoe County is entitled to summary judgment.  "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  But "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Id.* at 690–91; *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (noting that a plaintiff can establish municipal liability by showing that "the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity" (internal quotation marks omitted)).**[6]**

---

**[5]** Although we reverse the summary judgment in favor of Wilcox and Kennedy, we affirm the district court's summary judgment in favor of Amy Reynolds because the plaintiffs have not alleged any facts suggesting that she was involved with the decision to take custody of B.W.

**[6]** Because the district court dismissed Kirkpatrick's claims and did not think that the complaint included B.W. as a plaintiff, the district court addressed, but did not fully analyze, the *Monell* claim.  It nevertheless

The County represents that it does not have a policy of removing children from their parents absent a finding of imminent danger, but there is evidence in the record that contradicts the County's claim. That is, record evidence suggests that the County had an unofficial, unconstitutional custom of taking custody of children under non-exigent circumstances without obtaining prior judicial authorization. As a result, this case implicates the so-called "direct path to municipal liability." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1185 (9th Cir. 2002).

Neither Ellen Wilcox nor Linda Kennedy was familiar with the process for obtaining a warrant before taking custody of a child. Wilcox, the social worker in charge of B.W.'s case, stated that she never received training on how to obtain a warrant while she was employed by Washoe County from 2007 through 2009, and in those two years, she had never actually obtained a warrant. Under questioning, Wilcox admitted that a hypothetical child in B.W.'s circumstances was not in imminent danger:

> Q: But a child is not going to be returned to his father for four days. Is that imminent danger?
>
> A: No.

But she testified that she would likely remove such a child anyway, and without a warrant:

---

expressed concern with Washoe County's practices. The *Monell* question was briefed by both parties and discussed at oral argument. The record is sufficiently developed for us to determine whether the County was entitled to summary judgment.

Q:  So what do you do for that child when the mother insists on returning him to a dangerous situation and the father insists on getting him in that dangerous situation, no questions asked, you have already determined and everybody agrees it's a danger?

A:  Then we remove the child.

Q:  You don't get a warrant?

A:  No.

Q:  The child you admitted is not in imminent danger.

A:  No.  We don't get a warrant.

Q:  But would you remove the child *even though the danger may be three or four days away*?

A:  Yes.

Wilcox later attributed her answer to Washoe County's unofficial custom or protocol:

Q:  Let me ask you an obvious question.  If the child wasn't in danger in the hospital and was there for several days, why didn't you seek a warrant before you removed the child from mom?  Is it because you didn't know you had to?  You weren't trained on that?

> A: It wasn't the protocol of Washoe County. No one told me to get a warrant and they didn't train me how to go about getting a warrant.
>
> Q: Or did they even tell you you could get a warrant?
>
> A: No. They didn't.

Kennedy—who supervised between five and seven social workers, including Wilcox at the time—confirmed that it was "not in our general practice" to obtain a warrant before removing a child:

> Q: So your best recollection is that as of July of '08, Washoe County Child Protective Services did not obtain court warrants prior to the removal of a child in any circumstances?
>
> A: I wouldn't say in no circumstances. But not in our general practice. No.
>
> There could be—we had asked for warrants sometimes when there was like a suspected kidnapping or something like that where we had some prior knowledge, let's say.
>
> But generally speaking, we did not. I don't recall ever getting a warrant to go out with one of my investigators to go out and pick up a child unless it was a special circumstance.

She elaborated that in cases like B.W.'s, she might have obtained a warrant "in a rare instance," but she did not recall ever doing so:

> Q:    You mentioned that you have a recollection of obtaining—of seeking warrants in situations like kidnappings and things like that.
>
> . . . .
>
> What I'm more interested in is the case where you've gotten a complaint or a report of some sort of child neglect that triggers an investigation which leads to determining that a child needs to be removed.
>
> Okay?    That's the case I'm more interested in.
>
> Under those kind of circumstances, do you have any knowledge of ever obtaining a warrant to remove a child under those type of general circumstances?
>
> A:  I do not recollect doing that.  No.
>
> Q:  So it would be safe to say that in your career with Washoe County Child Protective Services you're not aware of ever obtaining a warrant to remove a child from a parent?
>
> A:    I don't recollect ever doing that. However, that is not to say that it could have

occurred in a rare instance that I'm not just
recalling. It was not a general practice ever to
get a warrant.

While discussing the process of removing a child from its
parent without a warrant, Kennedy noted that "Washoe
County has all kinds of policies and procedures for
everything," and that the "policy[] was to never get warrants"
when removing children:

Q: You stated when a baby or a child is
kidnapped that would be a situation where
you would get a warrant.

A: Generally speaking, yes.

    That happens very rarely.

Q: A warrant to remove the child from the
kidnapper or a warrant to arrest the
kidnapper?

A: A warrant to remove the child.

    We have nothing to do arresting people.

Q: So if it's a kidnapper you get a warrant to
remove it but if it's a parent you don't?

A: That's our policy, was never to get
warrants when we remove children when I
worked as a supervisor.

> Q: There was a policy to not get warrants or there was no policy?
>
> A: There was no policy related to warrants.

Like Wilcox, Kennedy understood that the "legal criteria" for warrantless removals mandated the existence of an "imminent risk to the well being of that child." However, Kennedy's definition of "imminent risk" was hazy, at best.

Importantly, Kennedy had "no recollection" of B.W.'s case, and she did not know what facts were used to justify B.W.'s removal. But speaking in the abstract and using her knowledge as a supervisor, she said that under these circumstances a child could be removed without a warrant:

> Q: Based upon your review of [B.W.'s case] can you tell me all of the facts that were relied upon to remove—to make the decision to remove [B.W.]?
>
> A: I can tell you I don't know what facts Amy [Reynolds] used in this regard.
>
> But I can tell you that as far as a supervisor the fact that the child tested positive for methamphetamine, that the mother admitted to recent methamphetamine use, that she admitted that she's unemployed, she does not have stable housing and then after she said she used methamphetamine during her entire pregnancy, which means we also have a drug baby here, that drug babies are generally more difficult to parent because

they get agitated, they cry a lot, so we have a mom who is not necessarily stable and she has a difficult child, she lives with friends from place to place, she has a CPS history, which apparently we also had other children of hers in care, all of that would have been researched prior to removing that child to see if we had prior history on her, what it was and the fact that she never followed through for her other children to try to get them back, never followed through on any services, when you look at that whole picture, then that would be why you would have removed that child.

Like Wilcox, Kennedy said no warrant was necessary to remove B.W., even though Kennedy also admitted that B.W. was not in any immediate danger:

> Q: In your opinion, is the maternity floor of Renown Regional Medical Center considered a safe environment by Washoe County Child Protective Services?
>
> A: Yes. It is.
>
> Q: And the child, [B.W.], was not in any danger at Renown, was she?
>
> A: No.
>
> Because there were nurses generally present.
>
> . . . .

Q:  The baby would be in imminent danger if Rachel checked out of the hospital with the baby?  Is that basically what you're saying?

A: We would consider that imminent danger. Yes.

Q:  What was the imminent danger to the baby while in the hospital?

A:  I don't know that the child was in imminent danger there.

. . . .

Q:  Would [there] be [an imminent risk to the child] if mom took the child from the hospital?

A: Yes.

Q:  But in the hospital it wasn't imminent risk?

A: Right.

While, as Judge Kozinski notes, Dissent at 40, the only evidence of an unofficial custom comes from two depositions, both Wilcox and Kennedy traced their actions in B.W.'s case to the "general practice" and "protocol" in Washoe County.  Wilcox started working at WCDSS in June of 2007, a year before she handled B.W.'s case.  Kennedy worked as a social worker for twenty-two years in various offices before retiring; she testified that she spent seven of

those years working in the Child Protective Services department at WCDSS. Based on their experience working at WCDSS, both Wilcox and Kennedy should have known the constitutional standard for removing a child: Government officials must obtain a warrant before removing a child unless they have "reasonable cause to believe that the child is in imminent danger of serious bodily harm and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Mabe*, 237 F.3d at 1106 (quoting *Wallis*, 202 F.3d at 1138). But neither did. Instead, both understood that the "general practice" and "protocol" in Washoe County was to remove children without obtaining warrants. Wilcox admitted that B.W. was not in imminent danger at the hospital, but she did not first obtain a warrant before removing B.W. because "[i]t wasn't the protocol of Washoe County." Kennedy could not even remember B.W.'s specific case, but she relied on her knowledge as a WCDSS supervisor to confirm that no warrant was necessary to remove B.W. because "[i]t was not a general practice ever to get a warrant."[7]

Because the evidence presented here creates at least an inference of an unconstitutional, unofficial custom in Washoe County, the County is not entitled to summary judgment. Although the plaintiffs failed to compile any evidence of any other constitutional violations—that is, specific instances where Washoe County social workers took custody of

---

[7] Whether the unofficial County policy was *not* to get warrants or was silent on getting warrants, either policy would be unconstitutional because government employees are automatically required to get warrants unless the child is in "imminent danger of serious bodily harm" and a speedy removal "is reasonably necessary to avert that specific injury." *Mabe*, 237 F.3d at 1106 (quoting *Wallis*, 202 F.3d at 1138).

children without obtaining a warrant when they were constitutionally required to do so—we think there is minimal evidence sufficient to controvert the County's *Monell* defense at this stage of the proceedings. The record is relatively sparse (with depositions from only two WCDSS workers), and Wilcox's and Kennedy's testimonies of the imminent danger standard are unclear, but "ambiguity in favor of the defendant is not sufficient" to "dispose of a case on summary judgment." *Sery*, 513 F.3d at 972 ("If a reasonable person could side with the plaintiff's interpretation of events, the issue must survive for trial."). A triable issue exists as to whether the root of the unconstitutional behavior exhibited in B.W.'s case lies in the unofficial operating procedure of Washoe County or in the errant acts of individual social workers, and this question should go to a jury.

IV

We affirm the district court's summary judgment in favor of all of the defendants on the claim alleged by Kirkpatrick on his own behalf. We reverse the district court's summary judgment in favor of Ellen Wilcox, Linda Kennedy, and Washoe County on the claim that they violated B.W.'s Fourth Amendment right to be free from unreasonable seizures.[8] We remand to the district court for further proceedings on the Fourth Amendment claim filed on behalf of B.W. against these three defendants. We affirm the district court's summary judgment in favor of Amy Reynolds with respect to all claims because the plaintiffs have not alleged any facts

---

[8] Because we reverse the district court's grant of summary judgment in favor of Washoe County, we deny as moot Kirkpatrick's motion for judicial notice of the "papers and pleadings on file in the case of *Garver v. County of Washoe*, Ninth Circuit docket number 11-18015."

suggesting that she was involved with the decision to take custody of B.W.  Each party shall bear its own costs on appeal.

**AFFIRMED in part, and REVERSED in part.**

KOZINSKI, Circuit Judge, dissenting in part:

This term the Supreme Court once again summarily reversed a lower court for failing to appreciate that a state official is protected by qualified immunity unless "every reasonable official [in the defendant's situation] would have understood that what he is doing violates" a constitutional right. *Taylor* v. *Barkes*, No. 14-939, 2015 WL 2464055, at *2 (U.S. June 1, 2015) (internal quotation marks omitted).  The Court has stressed time and again that, "[w]hen properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft* v. *al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). The majority ignores that clear admonition, and imposes personal liability on two child protective service workers whose actions were anything but malicious or incompetent.

Under the majority's holding, Ellen Wilcox and Linda Kennedy are exposed to liability because they removed a vulnerable baby, B.W., from the care of her mother, Rachel. Rachel was a drug addict who had taken methamphetamine so recently that it was found in her daughter's blood at the time of the child's birth.  Rachel previously had two other children removed from her custody because of her manifest inability to care for them.  She also had no fixed address, and therefore no way of being found, had she left the hospital.

Had Rachel absconded with B.W., the baby's life could well have been in peril.

The majority doesn't appear to dispute this conclusion; nonetheless it finds there was no "imminent danger of serious bodily harm" to B.W. *Rogers* v. *Cnty. of San Joaquin*, 487 F.3d 1288, 1295 (9th Cir. 2007). The majority reasons that B.W. "would have very likely remained in the hospital . . . while the defendants requested a warrant" due to the informal "hold" the Washoe County Department of Social Services placed on her. Op. at 19. But, "very likely" is cold comfort when the life of a newborn baby is at stake. In any event, this crucial inference is entirely speculative. The majority fails to hold plaintiffs to their burden of "identify[ing] *affirmative* evidence from which a jury could find" a violation of clearly established law. *Crawford-El* v. *Britton*, 523 U.S. 574, 600 (1998) (emphasis added).

There simply is no evidence in the record that the informal "hold" would have prevented Rachel from leaving the hospital and taking B.W. with her. It is undisputed that the "hold" didn't constitute a formal restriction on their movement—indeed, if it did, then the "hold" itself would have been a seizure. Because the hospital didn't have the lawful authority to restrain Rachel or B.W., it was at least possible that mother and daughter could have left while a warrant application was pending. Reasonable minds might disagree as to the precise quantum of risk faced by B.W., but, under the circumstances, it was hardly malicious or "plainly incompetent" of Wilcox and Kennedy to temporarily take B.W. out of harm's way. *al-Kidd*, 131 S. Ct. at 2085 (internal quotation marks omitted).

We've been cautioned numerous times to undertake our qualified immunity analysis "in light of the specific context of the case, not as a broad general proposition." *Brosseau* v. *Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted). A test like *Rogers* that is "cast at a high level of generality" constitutes clearly established law only "in an obvious case." *Id.* at 199. At the time B.W. was taken into custody, we had never applied *Rogers* in the context of an especially vulnerable child, like a baby, or in a situation where social workers have no means of locating a child once it leaves their immediate supervision. *Rogers* alone cannot have placed *every* reasonable official on notice that taking B.W. into custody was unconstitutional. I worry that future babies will pay with their lives because social workers hesitate to take them into custody based on today's decision.

Nor am I convinced that the county should be liable under *Monell*. The few remarks Wilcox and Kennedy made during their depositions, standing alone, don't support an inference that there is a practice of constitutional violations "so persistent and widespread as to practically have the force of law." *Connick* v. *Thompson*, 131 S. Ct. 1350, 1359 (2011). There is nothing else. I therefore respectfully dissent from Parts III.B.2 and III.B.3 of the majority opinion.