**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL N. JONES, an individual; JILL JONES, an individual; G. J., an individual, *Plaintiffs-Appellees*, <br><br> v. <br><br> COUNTY OF LOS ANGELES, *Defendant*, <br><br> and <br><br> DR. CLAUDIA WANG, an individual, *Defendant-Appellant*. | No. 12-55995 <br><br> D.C. No. 2:11-cv-02851-SJO-VBK <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
April 11, 2014—Pasadena, California

Filed September 21, 2015

Before: N. Randy Smith and Mary H. Murguia, Circuit
Judges, and Stephen M. McNamee, District Judge.[*]

Opinion by Judge Murguia;
Dissent by Judge McNamee

---

**SUMMARY[**]**

---

**Civil Rights / Qualified Immunity**

The panel affirmed the district court's denial of Dr.
Claudia Wang's motion for summary judgment based on her
alleged qualified immunity in a 42 U.S.C. § 1983 action
brought against Dr. Wang.

The Jones family alleged that Dr. Wang violated their
Fourth and Fourteenth Amendment rights and committed
various torts during her investigation into whether G.J. had
been abused.

The panel held that, resolving all factual disputes in the
Joneses' favor, the alleged conduct of Dr. Wang could
support a claim that Dr. Wang violated the Joneses' clearly
established constitutional rights. Namely, the panel held that
the Joneses' version of the facts supported a claim that Dr.
Wang seized G.J. from his parents without exigent

---

[*] The Honorable Stephen M. McNamee, United States District Judge for
the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

circumstances. The panel held that because both parts of the qualified immunity test were satisfied, the Joneses were entitled to attempt to prove their version of the facts to a jury and summary judgment was not appropriate.

The panel also held, concerning Dr. Wang's asserted state statutory immunities to the Joneses' state-law claims, that Dr. Wang was not entitled as a matter of law to the reporters' privilege under Cal. Penal Code § 11172(a) or discretionary immunity under Cal. Government Code § 820.2.

District Judge McNamee dissented, and he would find that Dr. Wang is entitled to qualified immunity because she did not violate either the Fourth Amendment or clearly established law.

---

**COUNSEL**

Donald A. Garrard (argued) and Steven D. Davis, Garrard & Davis LLP, Santa Monica, California, for Defendant-Appellant.

Robyn C. Crowther (argued), Michael J. Proctor, Jeffrey M. Chemerinsky, Caldwell Leslie & Proctor, PC, Los Angeles, California, for Plaintiffs-Appellees.

---

## OPINION

MURGUIA, Circuit Judge:

The Jones family—Jill, Michael, and their son G.J.—brought this action under 42 U.S.C. § 1983 alleging that Dr. Claudia Wang violated their Fourth and Fourteenth Amendment rights and committed various torts during her investigation into whether G.J. had been abused. The district court denied Dr. Wang summary judgment on her qualified immunity defense. We conclude that, resolving all factual disputes in the Joneses' favor, the alleged conduct of Dr. Wang can support a claim that Dr. Wang violated the Joneses' clearly established constitutional rights.

## I. Factual and Procedural Background

Dr. Wang appeals the district court's denial of summary judgment on her qualified immunity defense. We accept as true all of the Joneses' evidence, and we draw all justifiable inferences in the Joneses' favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam).

The events underlying this suit begin on the evening of February 24, 2010. As Jill Jones descended the steps from the loft in her Santa Monica condominium with her sleeping infant son G.J. in her arms, she tripped and G.J. slipped out of her grip. G.J. tumbled down several stairs and landed on his head on the hardwood floor. Jill rushed G.J. to the Emergency Department at the Santa Monica UCLA Medical Center.

At the Emergency Department, a CT scan of G.J.'s head revealed a complex fracture on the back of G.J.'s skull. G.J.'s

ribs were also fractured, but because the bones were still aligned, the fractures were not visible on the x-ray of G.J.'s chest done that day. Hospital staff made a routine report of G.J.'s injury to the LA County Department of Children and Family Services (DCFS), noting that G.J.'s injuries were consistent with Jill's explanation that she had accidentally fallen down the stairs. G.J. stayed in the hospital for two days after the accident. On February 26, 2010, he was discharged to his parents. After Jill brought G.J. home from the hospital, she noticed a popping noise coming from G.J.'s chest, which was caused by the undetected rib fractures. Jill was concerned because G.J. appeared to be in pain every time she heard a pop from his chest.

On March 4, 2010, Nancy Hayes, UCLA's Suspected Child Abuse and Negligence (SCAN) team case manager, referred G.J.'s case to Dr. Claudia Wang, the SCAN team medical director. Dr. Wang reviewed the case and concluded that G.J.'s injuries were unusual and potentially, but not necessarily, inconsistent with Jill's explanation. Even though the skull fracture could be consistent with Jill's explanation that G.J. had fallen down stairs and hit his head, because of the fracture's severity, Dr. Wang decided to order routine child abuse screening tests and examine G.J. herself. Dr. Wang called G.J's pediatrician, who called Jill and coordinated with Jill to bring G.J. in for an opthalmological exam, a skeletal survey x-ray, and a physical examination with Dr. Wang the following morning. Jill's pediatrician told Jill that the tests were routinely done to rule out child abuse and should have been done before G.J. was discharged from the hospital the week before. Dr. Wang also called Jill and assured her that the tests were routine. Jill was also aware that these tests were routinely conducted to investigate child abuse because of her work as a lawyer for L.A. County Social

Services. Jill told Dr. Wang about the popping she heard in G.J.'s chest and the pain it was causing G.J.

The next day, March 5, 2010, Jill brought G.J. to the UCLA Westwood campus medical facilities for the tests as scheduled. The opthamological examination showed that G.J. had no retinal hemorrhages, which are often found in infants with abusive head trauma.

The first radiologist to interpret G.J.'s skeletal survey, Dr. Ines Boechat, told Dr. Wang that she saw fractures on G.J.'s sixth and seventh right ribs on the posterior (back) side. Dr. Wang looked at the skeletal survey images herself and compared them with the chest x-ray taken at the Emergency Department immediately after the fall, which appeared not to show any rib fractures. Dr. Wang was not able to make out the fractures on G.J's right ribs that Dr. Boechat identified, but she did see fractures on G.J.'s left sixth and seventh ribs. Dr. Wang surmised that the left fractures were new, while the right side fractures were not. Dr. Boechat suggested to Dr. Wang that the skeletal survey might faintly show another skull fracture on the left side of G.J.'s skull that had also not been detectable on the February 24, 2010, CT scan. Dr. Boechat recommended that Dr. Wang get an opinion from another radiologist.

At Dr. Wang's request, a second radiologist, Dr. Ted Hall, reviewed both the chest x-ray from the Emergency Department and that morning's skeletal survey. Unlike Dr. Boechat and Dr. Wang, Dr. Hall interpreted G.J.'s skeletal survey to show fractures on G.J.'s sixth and seventh ribs on both sides. Dr. Hall opined that the right-side fractures might have been present on the February 24 chest x-ray, but he did not see the left-side fractures on that x-ray image. Dr. Hall

saw no second fracture on the left side of G.J.'s skull. Dr. Hall also disagreed with Dr. Wang's observation that G.J. might have fractures on his femur and tibial bones. He explained to her that what she suspected were fractures were actually a normal variant in infant legs.

After consulting with specialists after that morning's child abuse screening tests, Dr. Wang knew that (1) G.J. did not have retinal hemorrhaging, and (2) G.J. had rib fractures. Dr. Wang concluded—mistakenly, as it turned out—that G.J.'s ribs had been fractured after the accident. Before meeting with Jill or examining G.J., Dr. Wang called Nancy Hayes, the SCAN team case manager, and asked her to report G.J.'s case to DCFS. Dr. Wang also called the UCLA police department because she was concerned that Jill might try to leave the clinic with G.J. When the police officers arrived, Dr. Wang spoke with them and asked them to remain in the clinic while she met with Jill.

Dr. Wang met with Jill in the Pediatric Ambulatory Clinic. Jill recounted for Dr. Wang the accident and G.J.'s fall down the stairs. Dr. Wang then informed Jill that, as a mandated child abuse reporter, she had requested that a report be made to DCFS and the UCLA police because G.J.'s injuries were compatible with non-accidental trauma. Despite Dr. Hall's opinion that G.J. did not have a second skull fracture, Dr. Wang told Jill that G.J. might have an additional skull fracture and possibly leg fractures and recommended that G.J. have another CT scan. Dr. Wang also recommended to Jill that Jill admit G.J. into the hospital for a bone specialist consult to determine whether G.J. had a metabolic bone disorder that was causing the fractures. Dr. Wang's primary purpose, however, in recommending to Jill that G.J. be hospitalized—which she did not tell Jill—was to detain G.J.

at the hospital and prevent Jill from taking G.J. home. Dr. Wang later testified that had she not suspected abuse, she would have told the Joneses that they could take G.J. home and return in the following weeks for outpatient testing. In fact, Dr. Wang testified that the main reason for admitting G.J. was that she did not have a plan to discharge him safely to his home. Dr. Wang also acknowledged that, because it was Friday, admitting G.J. into the hospital would likely keep him there over the weekend, preventing his parents from taking him home until at least Monday, March 8, 2010. After recommending an additional CT scan and hospitalization, Dr. Wang informed Jill that officers from the Santa Monica police department were there to interview her.

Jill agreed to the CT scan and to admit G.J. to the hospital. Jill believed that the CT scan was medically necessary. Jill's sister, who came to the hospital to support Jill, remembered that she and Jill became hysterical after hearing about G.J.'s new injuries and learning that he needed to be re-hospitalized. One of the Santa Monica police officers recalled that Jill seemed exhausted but agreed to the course recommended by Dr. Wang because she was concerned about G.J.'s well-being.

After the additional CT scan, it was nearly 5:00 p.m., closing time for the Pediatric Ambulatory Clinic. Two Santa Monica Police Department officers, SCAN team case manager Nancy Hayes, and pediatric resident Dr. Adrian Castro escorted Jill, her husband Michael, who had by now joined Jill at the clinic, and G.J. to the Emergency Department to admit G.J. to the hospital. Before the group left for the Emergency Department, Dr. Wang told Hayes to make sure that Jill and Michael did not take G.J. home.

At 5:49 p.m. on March 5, while the Joneses were en route to the Emergency Department from the Pediatric Ambulatory Clinic, Dr. Wang received a page confirming that the CT scan did not show that G.J. had a second skull fracture.

Once the Joneses arrived at the Emergency Department, where the admission process was to begin, Jill began to realize that Dr. Wang had misled her and her husband into thinking that G.J. needed to be hospitalized. Dr. Cooper, the Emergency Department attending physician, told the Joneses that there was no reason G.J. needed to be admitted to the hospital simply to get the blood work Dr. Wang had ordered. Dr. Cooper also told Jill that the CT scan showed that G.J. did not have a second skull fracture, which Dr. Wang had not told Jill or Michael. The Joneses asked to take G.J. home.

At 8:06 p.m. on March 5, Dr. Castro, the pediatric resident who accompanied the Joneses from the Pediatric Ambulatory Clinic to the Emergency Department, paged Dr. Wang: "Parents now threatening to leave. [Social worker] calling DCFS to ask if on official hold and whether we need to call security to assure they do not leave. Do you know if on hold or should we place? Thanks, Adrian." Dr. Wang told Dr. Castro that only DCFS had the authority to place a hospital hold, so if the Joneses tried to leave with G.J., Dr. Castro could not use the security or police to stop them.

Dr. Wang spoke with Shawn Rivas, the DCFS social worker assigned to the Joneses' case, and admitted she did not have a definitive diagnosis of child abuse and wanted time to conduct further tests. Dr. Wang also stated that she believed G.J. would be in danger if released. Rivas decided that G.J. was not in immediate danger and that he therefore

did not have a basis to issue a hospital hold under California state law.[1]

At around midnight, Rivas met with the Joneses in the Emergency Department. The Joneses asked Rivas if they could take G.J. home. Rivas told the Joneses that Dr. Wang suspected that G.J.'s injuries were not accidental and led the Joneses to believe that the decision of whether the Joneses could take G.J. home lay with Dr. Wang. Rivas advised Jill and Michael to "keep playing ball" and not try to take G.J. home. Rivas added that if they resisted Dr. Wang's hospitalization order and tried to take G.J. home, not only would G.J. be "detained," but it would look like they were refusing medical treatment, which could provide Rivas with a basis to remove G.J. from their custody.

Early in the morning on Saturday, March 6, 2010, the Joneses signed Admission and Medical Service Agreements forms for G.J., and G.J. was transferred to the UCLA Medical Center in Santa Monica and given a special tracking bracelet. Dr. Wang ordered that there be a sitter in G.J.'s room; the sitter stayed in G.J.'s room at all times to prevent Jill and Michael from being alone with G.J.

---

[1] By statute, a county welfare department social worker may assume and maintain temporary custody of a minor without a warrant when the social worker has reasonable cause to believe the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child," and the social worker has reasonable cause to believe the child is in immediate danger of physical abuse. Cal. Welf. & Inst. Code §§ 306(a)(2), 300(b)(1).

On Sunday, March 7, 2010, Rivas still believed that there was insufficient evidence "to issue a hold or detain G.J.," and continued to wait for Dr. Wang's conclusions.

On Monday, March 8, 2010, Dr. Wang told Rivas that G.J.'s injuries were "highly suspicious" for abuse and asked that he place a hospital hold. Rivas issued the hold.

Jill and Michael lost physical custody of G.J. for months pending the resolution of dependency proceedings brought by DCFS in juvenile court. Ultimately, the Commissioner presiding over the proceedings determined that G.J. had not been abused and that there was no risk that G.J. would be abused in the future. Jill, Michael, and G.J. Jones filed the instant suit against Dr. Wang and several DCFS employees and county defendants, asserting violations of the Joneses' federal and state constitutional rights as well as various state law tort claims. The district court denied Dr. Wang's motion for summary judgment on the merits and her qualified immunity defense. Dr. Wang now appeals the district court's denial of qualified immunity.

## II. Qualified Immunity

Although we generally do not have jurisdiction under 28 U.S.C. § 1291 to review a district court's denial of summary judgment because it is not a "final decision," we have jurisdiction under § 1291 over a defendant's appeal from a denial of summary judgment on qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).[2] This is because qualified immunity "is an *immunity from suit* rather

---

[2] Therefore, we lack jurisdiction to review the district court's denial of summary judgment to Dr. Wang on the merits of the Joneses' claims.

than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526. A district court's "denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations." *Id.* at 527. When the district court denies summary judgment on qualified immunity grounds, "the appealable issue is a purely legal one: whether the facts alleged [by the plaintiff] support a claim of violation of clearly established law." *Id.* at 528 n.9. Thus, we have jurisdiction to consider whether, accepting the Joneses' version of the events of March 5–8, 2010, Dr. Wang's alleged conduct supports a claim of violation of a clearly established legal standard; if so, the district court's denial of qualified immunity was appropriate. *See Wilkins v. City of Oakland*, 350 F.3d 949, 952 (9th Cir. 2003).

Section 1983 creates a cause of action against any person who, acting under color of state law, violates the federal constitutional rights of another person. *See* 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, the qualified immunity analysis has two prongs: (1) whether the official violated the plaintiff's constitutional rights, and (2) whether the right violated was clearly established at the time of the official's conduct. *Id.* at 232. For a right to be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that
right. That is not to say that an official action
is protected by qualified immunity unless the
very action in question has previously been
held unlawful, but it is to say that in light of
pre-existing law the unlawfulness must be
apparent.

*Calabretta v. Floyd*, 189 F.3d 808, 812 (9th Cir. 1999)
(internal quotation marks omitted). However, "[s]pecific
binding precedent is not required to show that a right is
clearly established for qualified immunity purposes." *Id.*
(internal quotation marks omitted). Whether specific facts
constitute a violation of established law and whether that law
was clearly established are both legal determinations that we
review de novo. *Mabe v. San Bernardino Cnty., Dep't of Pub.
Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001).

### Step One: Violation of a Constitutional Right

We begin with whether the Joneses' version of the facts
can support a claim that Dr. Wang violated their
constitutional rights.

[I]n the area of child abuse, as with the
investigation and prosecution of all crimes,
the state is constrained by the substantive and
procedural guarantees of the Constitution. The
fact that the suspected crime may be
heinous—whether it involves children or
adults—does not provide cause for the state to

> ignore the rights of the accused or any other parties.

*Wallis v. Spencer*, 202 F.3d 1126, 1130 (9th Cir. 1999).

Families in child abuse investigations are protected by two provisions of the Constitution, the Due Process Clause of the Fourteenth Amendment and the Search and Seizure Clause of the Fourth Amendment. "Parents and children have a well-elaborated constitutional right to live together without governmental interference. That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Id.* at 1136 (citations omitted). Under the Fourteenth Amendment right to familial association, an official who removes a child from parental custody without a warrant "must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007). The child subjected to seizure is also protected by the Fourth Amendment's prohibition against unreasonable searches and seizures. *Kirkpatrick v. Cnty. of Washoe*, — F.3d —, No. 12-15080, 2015 WL 4154039, at *2–*3 (9th Cir. July 10, 2015); *Wallis*, 202 F.3d at 1137 n.8. While the constitutional source of the parent's and the child's rights differ, the tests under the Fourteenth Amendment and the Fourth Amendment for when a child may be seized without a warrant are the same. *Wallis*, 202 F.3d at 1137 n.8. The Constitution requires an official separating a child from its parents to obtain a court order unless the official has reasonable cause to believe the child is in "imminent danger of serious bodily injury." *Id.* at 1138. Seizure of a child is reasonable also where the official obtains

parental consent. *See James v. Rowlands*, 606 F.3d 646, 652 n.2 (9th Cir. 2010) (noting that "seizing and interrogating a suspected child abuse victim without parental consent violates the child's Fourth Amendment rights" absent a warrant, court order, or exigent circumstances).

Our analysis of whether the Joneses' allegations support a claim that Dr. Wang violated their constitutional rights centers on two issues. The first is whether the Joneses' version of the facts supports a claim that Dr. Wang seized G.J. under the meaning of both the Fourth and Fourteenth Amendments; in other words, in this case, whether Wang's conduct as the Joneses characterized it would have caused reasonable parents in the Joneses' position to believe they could not refuse consent to G.J.'s hospitalization. If so, the second issue is whether the Joneses' version of the facts further establishes that this seizure was justified by exigent circumstances. We conclude that the Joneses' account of Dr. Wang's conduct permits a conclusion that Dr. Wang seized G.J. without consent and without reasonable cause to believe that G.J. was in imminent danger of serious bodily harm, thereby violating the Joneses' constitutional rights.

### *Seizure*

Typically, a seizure of a person occurs where, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This standard does not fit neatly in the context of child abuse investigations, because to ask whether a reasonable child would feel free to leave under the circumstances overlooks a parent's right to exercise custody over her children. Accordingly, a child is seized for purposes

of the Fourth and Fourteenth Amendments when a representative of the state takes action causing a child to be detained at a hospital as part of a child abuse investigation, such that a reasonable person in the same position as the child's parent would believe that she cannot take her child home. *See Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (citing *Mendenhall*, 446 U.S. at 554) (holding that a child was seized when a hospital told the child's parent that she could not take the child home); *California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("'A seizure is a single act, and not a continuous fact.'" (quoting *Thompson v. Whitman*, 85 U.S. 457, 471 (1873)).

Practically speaking, then, the question whether a reasonable parent would feel free to take a child home from the hospital is indistinguishable from the question whether that parent would feel free to withhold consent to the hospital's retaining the child. *See id.* "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973); *see also United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir. 1980) (concluding that the defendant's consent to a search of his briefcase was coerced, and therefore ineffective, where a law enforcement agent threatened to arrest him unlawfully if consent was withheld). Accordingly, our analysis of whether the Joneses' allegations could support a claim that Dr. Wang seized G.J. turns on whether the Joneses knowingly and voluntarily consented to Dr. Wang's alleged seizure.

We conclude that the Joneses' version of the facts supports a rational conclusion that, due to Dr. Wang's alleged conduct, reasonable parents in the Joneses' position would

not have felt free to leave with G.J. According to the Joneses, Dr. Wang coerced them into consenting to G.J.'s hospitalization—and not withdrawing that consent throughout the weekend—in a number of ways. First, Dr. Wang told the Joneses that the tests she wished to perform would require G.J.'s hospitalization, despite knowing that the tests could be conducted on an outpatient basis. This misrepresentation would lead a reasonable parent to believe that she could not withhold consent lest she be deemed to have refused her child necessary medical treatment.[3]

Second, Dr. Wang marshaled considerable authority to cajole the Joneses into granting consent and to prevent them from withdrawing it. Dr. Wang informed Jill that Dr. Wang was a mandated child abuse reporter and that G.J.'s injuries were consistent with child abuse. Dr. Wang contacted the police, who interviewed Jill on the matter of child abuse and accompanied G.J. and the Joneses to the ER. Dr. Wang also told Rivas that the tests she wished to perform required hospitalization, prompting Rivas to tell the Joneses that they should "keep playing ball" and that G.J. would be detained if

---

[3] In declaring that the only "affirmative evidence" that Dr. Wang seized G.J. was "actions of third parties," Dissent 33, the dissent overlooks Dr. Wang's deliberate misrepresentation that the testing she wished to perform required hospitalization.

The dissent also suggests that we have impermissibly examined Dr. Wang's "subjective intent," rather than the objective circumstances surrounding G.J.'s seizure. *Id.* at 34 (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)). We respectfully disagree. Dr. Wang represented to the Joneses that G.J.'s tests required hospitalization. This was untrue. These are both objective facts, neither of which depends on Dr. Wang's subjective intent in making the misrepresentations. And based on these facts, reasonable parents in the Joneses' position would not feel free to refuse G.J.'s hospitalization.

the Joneses tried to take him home. Dr. Wang coordinated behind the scenes with Hayes, the SCAN team case manager, to keep G.J. at the hospital, knowing that she could not formally take G.J. into custody. All of this took place in the face of the Joneses' repeated requests for permission to take G.J. home. Most importantly, at some point during the weekend, Dr. Wang directed that a sitter be placed in G.J.'s room to prevent the Joneses from being alone with him. Short of a formal hold, there is no stronger message to parents that they are not free to make decisions for their child than that the state does not trust them to be alone with their infant son.[4]

We offer no opinion on the ultimate question of whether the Jones's constitutional rights were violated. We decide only that a jury is needed to determine what a reasonable parent in the Jones's position would have believed and whether Dr. Wang's conduct amounted to a seizure. Based on the facts that the Joneses have alleged, however, a rational jury could conclude that Dr. Wang's efforts would lead reasonable parents in the Joneses' position to believe that they could not take G.J. home. *See Kia P.*, 235 F.3d at 762. In short, the Joneses' allegations support a claim that Dr. Wang caused a seizure of G.J. For the same reasons, those allegations support a rational conclusion that the Joneses'

---

[4] The dissent observes that Dr. Wang told emergency staff not to interfere should the Joneses attempt to leave the hospital with G.J. Dissent 33. What the dissent overlooks is the record's lack of any evidence that the Joneses knew Dr. Wang had given this directive. If the Joneses did not know that Dr. Wang told emergency staff not to prevent them from leaving the hospital, then Dr. Wang's instruction has no bearing on whether a reasonable parent in the Joneses' position would feel free to refuse consent to G.J.'s hospitalization. *See Kia P.*, 235 F.3d at 762; *Schneckloth*, 412 U.S. at 228.

consent to G.J's hospitalization was involuntary and therefore ineffective.

### *Exigent Circumstances*

Seizure of a child is permissible under the Fourth and Fourteenth Amendments where there are exigent circumstances. Exigent circumstances exist where an official has "'reasonable cause to believe that the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant.*'" *Kirkpatrick*, 2015 WL 4154039, at *7 (quoting *Rogers*, 487 F.3d at 1294). On appeal from the district court's denial of qualified immunity at the summary judgment stage, we must determine whether the Joneses' account of the facts permits a rational conclusion that Dr. Wang had reasonable cause to believe that G.J. faced serious bodily harm, the risk of which was so imminent that injury was likely before a court order could be obtained. *See Rogers*, 487 F.3d at 1294. We conclude that, based on the Joneses' version of events, a rational jury could conclude that Dr. Wang's seizure of G.J. did not occur under exigent circumstances.

We do not take lightly the undisputed evidence that G.J. had newly discovered rib fractures on March 5, 2010, a week after the initial accident. However, there are several facts that undermine a reasonable belief that G.J. faced such imminent harm that Dr. Wang or DCFS had no time to obtain a warrant, and the question of exigency even in a close case should be put to a jury.

First, DCFS social worker Shawn Rivas, who had the statutory authority to issue a hospital hold, decided he had an insufficient basis to do so after speaking with Dr. Wang and

meeting with the Joneses. *See Mabe*, 237 F.3d at 1108 (social worker's decision to delay the removal of a child from a residence raised a "serious question" about the reasonableness of the belief that the child was in imminent danger); *see also Rogers*, 487 F.3d at 1296 ("That neither [the Child Protective Services social worker] nor the other staff members thought that the allegations required immediate action militates against a finding of exigency."). In fact, Rivas continued to conclude that a hospital hold was inappropriate until Monday, March 8, 2010, when Dr. Wang first told him that G.J.'s injuries were "highly suspicious." Rivas's understanding until March 8, 2010, when he finally issued the hospital hold, was that Dr. Wang had not concluded that G.J.'s rib fractures were the result of abuse and therefore that there was an insufficient basis for a hospital hold.

Second, aside from G.J.'s rib fractures, which could have been sustained by G.J. during the accidental fall, there was no evidence that the Joneses neglected G.J., and there was no evidence pointing to either Jill or Michael as the potential abuser. *See Wallis*, 202 F.3d at 1142 n.14 (noting that the state must have reasonable evidence that a specific parent is unfit and that the child is in danger from that parent and may not separate a child from one parent because of the real or imagined conduct of the other parent). During G.J.'s first hospitalization, every physician accepted Jill's story about the fall down the stairs, found nothing concerning about G.J.'s complex skull fracture, and allowed G.J. to return home with Jill and Michael after his hospitalization. It is undisputed that Jill appeared appropriately concerned about G.J. throughout the day on March 5. Jill willingly brought G.J. to the hospital for abuse screening tests. And there is no evidence that

Michael acted inappropriately after he arrived at the Pediatric Ambulatory Clinic on March 5.

According to the Joneses' version of the facts, even Dr. Wang was not sure whether G.J. had been abused or whether he would be in danger if he was sent home with his parents. She knew that G.J. had no signs of retinal hemorrhaging, no new skull fracture, and no leg fractures. At most, Dr. Wang had evidence of new rib fractures, but she admitted that even this evidence was not sufficient to show child abuse. Dr. Wang also told Dr. Castro on Friday, March 5, 2010, that security and the police should not be used to stop the Joneses if they tried to leave the hospital with G.J. This suggests that at the time she did not believe that G.J. would face an immediate threat of serious physical injury or death if he left the hospital with his parents, or at least that Dr. Wang could not persuade DCFS of such a threat. It was not until Monday, March 8, 2010, more than two days after G.J. was first admitted to the hospital, that Dr. Wang told Rivas that G.J.'s injuries were "highly suspicious" for child abuse and told him to order a hospital hold.

In sum, the Joneses' account of the evidence supports a claim that Dr. Wang seized G.J., and did so despite the absence of exigent circumstances.[5] Accordingly, the first

---

[5] The dissent suggests that we must defer to Dr. Wang's conclusions regarding G.J.'s injuries. Dissent 34. The question, however, is not whether Dr. Wang reasonably surmised that G.J.'s fractures were the result of abuse, but whether Dr. Wang could reasonably believe that G.J. was likely to come to serious harm in the time it would take to obtain a warrant. *See Rogers*, 487 F.3d at 1294. The dissent points to no evidence in the record to suggest that G.J. faced such an immediate risk of harm if permitted to return home with the Joneses, and we are aware of none. Under our longstanding precedent, mere suspicion that specific injuries

prong of the test for whether the district court correctly denied qualified immunity at the summary judgment stage has been satisfied.

### Step Two: Clearly Established Law

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" "[T]he salient question is . . . whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional."

*Tolan*, 134 S. Ct. at 1866 (alterations in original) (citation omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002)). Whether the law placed a state actor on reasonable notice that her conduct would violate the Constitution must be determined "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). We also must "take care not to define [this]

---

were the result of child abuse are not sufficient to detain a child. If we were to hold that Dr. Wang's suspicions justified a seizure in order to confirm those suspicions or lay them to rest, the protections promised to parents and their children by the *Wallis* line of cases would become illusory.

case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866. In other words, we must determine whether a reasonable state actor in Dr. Wang's position—viewing Dr. Wang's actions under the totality of the circumstances known to her and in the light most favorable to the Joneses—would know that (1) Dr. Wang's conduct "seized" G.J., and (2) exigent circumstances did not justify the seizure.

We begin our analysis with the principle that "[t]he constitutional right of parents and children to live together without governmental interference is well established." *Mabe*, 237 F.3d at 1107. Were we faced with a social worker who detained a child without exigent circumstances, this case would fall neatly within our existing case law. *See, e.g.*, *Kirkpatrick*, 2015 WL 4154039, at *9–*10 (social workers not entitled to qualified immunity for removing an infant from the hospital and placing her in a foster home without judicial authorization or a reason to believe that the child would be harmed while in the hospital); *Rogers*, 487 F.3d at 1295 (social worker not entitled to qualified immunity for removing children from parents' custody because children's bottle rot, malnourishment, and the disorderly conditions of their home did not present an imminent risk of serious bodily harm as a matter of law); *Mabe*, 237 F.3d at 1108–09 (social worker not entitled to qualified immunity for warrantless removal of child from parents' custody where facts undermined reasonableness of belief that child was in imminent danger of being molested by stepfather); *Wallis*, 202 F.3d at 1138–40 (police officers not entitled to qualified immunity for warrantless removal of children from parents' custody without specific, articulable evidence of imminent abuse). What makes this case more difficult is that Dr. Wang was a physician investigating child abuse, not a social

worker, and the seizure occurred in a hospital. Therefore, the question presented by this case is whether these two facts—that Dr. Wang was a physician investigating abuse, not a social worker, and that G.J. was detained in a hospital following his parents' consent to hospitalization—sufficiently differentiate this case from our precedent in child abuse investigations such that our precedent does not clearly apply. We conclude that our case law provided fair warning to Dr. Wang that detaining G.J. would violate the Constitution.**[6]**

First, our case law clearly establishes that Dr. Wang "seized" G.J. Though we address whether our cases give an official fair notice that her conduct violates the Constitution "'in light of the specific context of the case,'" the violation is sometimes so "obvious" as to be clearly established "even without a body of relevant case law." *Brosseau*, 543 U.S. at 198–99 (quoting *Katz*, 533 U.S. at 201). As characterized by the Joneses, Dr. Wang's conduct so obviously caused G.J. to be "seized" that no closely analogous case law is needed to alert her to the fact. Dr. Wang told the Joneses that the tests she wished to perform required hospitalization, despite knowing that they could be done on an outpatient basis. No

---

**[6]** The dissent suggests that our cases, such as *Rogers*, *Mabe*, and *Wallis*, cannot furnish clearly established law because other circuits disagree with them. Dissent 36, 38. However, this court regularly finds a principle to be clearly established based solely on its own decisions. *See Kirkpatrick*, 2015 WL 4154039, at *9–*10 (finding an infant's right not to be seized from his mother's custody at the hospital clearly established based on *Rogers*); *Rogers*, 487 F.3d at 1297 (finding the law governing removal of children from the home without judicial authorization clearly established based on *Mabe*, *Wallis*, and *Ram v. Rubin*, 118 F.3d 1306 (9th Cir. 1997)). We must continue to rely on our own cases to determine whether the law is clearly established until this court sitting en banc or the Supreme Court tells us that we may not.

reasonable physician could fail to understand that this misrepresentation would cause the Joneses to consent to hospitalize G.J., knowing that refusal could be construed as refusing medical treatment to their child. Dr. Wang also caused a SCAN team member to escort the Joneses to the ER and posted a sitter in G.J.'s hospital room over the weekend. Any reasonable physician would realize that this conduct communicated to the Joneses that they were not free to revoke their consent to G.J.'s hospitalization. That Dr. Wang seized G.J. is "obvious" enough to warrant affirming the district court's denial of summary judgment.[7] *See id.* at 199.

Second, our cases put a reasonable physician in Dr. Wang's position on notice that G.J.'s condition did not indicate an imminent risk of serious bodily injury. In *Rogers*, we held that two children's bottle rot and malnutrition, as well as the squalid conditions in their home, did not alone require the conclusion that serious injury would result if the children were not immediately removed. 487 F.3d at 1295–96. In addition, we observed that social workers had twice decided that complaints of the conditions in the children's home did not warrant immediate action. *Id.* at 1296. Here, as in *Rogers*, G.J. suffered injuries, but the record contains no evidence that G.J.'s medical condition indicated that he risked imminent, serious injury if not immediately removed from the Joneses' custody. Here, as in *Rogers*, a social worker familiar with G.J.'s

---

[7] The dissent appears to take issue with this reasoning. Dissent 37 n.3. The dissent does not, however, explain how it could be anything other than obvious to a reasonable medical professional that telling parents that their child must be hospitalized would cause reasonable parents to believe that they were not free to take their child home, especially after government officials warned the parents to "keep playing ball" or risk having their child detained.

condition—Rivas—believed that seizing G.J. was not warranted between March 5 and 8, 2010. Accordingly, *Rogers* clearly established that Dr. Wang's conduct between those dates was not justified by exigent circumstances.[8]

Our recent decision in *Kirkpatrick* supports our conclusion that Dr. Wang's efforts to keep G.J. in the hospital—as described by the Joneses—violated clearly established law. In *Kirkpatrick*, in July 2008, social workers removed a newborn infant from her methamphetamine-addicted mother and placed the infant with a foster parent without first seeking judicial authorization. 2015 WL 4154039, at \*1–\*2. We concluded that the social workers violated the infant's right to be free from unreasonable

---

[8] The dissent draws a number of factual distinctions between the matter before us and our earlier cases—Dr. Wang was not a social worker or police officer, G.J. was not removed from a home, G.J.'s injuries were more serious than those presented in other cases, and G.J. was too young to be able to communicate. Dissent 37–38. What the dissent does not explain is how these differences would deprive Dr. Wang of notice that her conduct violated the law. First, our case law makes clear that, when Dr. Wang took it upon herself to detain G.J. in the hospital, she acted as a government official investigating potential child abuse, not a physician. *See Mabe*, 237 F.3d at 1106 (holding that immunity turns not on "the official's title or agency, but on the nature of the function that the person was performing"). Second, whether G.J. was removed from the home or prevented from returning home makes no difference—Dr. Wang interfered with the Joneses' right to exercise custody over him. *See Kirkpatrick*, 2015 WL 4154039, at \*9. Third, the extent of G.J.'s injuries and his inability to speak do not change the ultimate question governing the lawfulness of Dr. Wang's conduct: whether Dr. Wang could reasonably believe that G.J. would be seriously harmed in the time necessary to obtain a warrant. *See Rogers*, 487 F.3d at 1294; *Mabe*, 237 F.3d at 1108. *Rogers* and *Mabe* provided ample notice that Dr. Wang's efforts to detain G.J. at the hospital—as described by the Joneses—violated the Constitution.

seizure. *Id.* at \*7–\*9. We went on to conclude that the social workers were not entitled to qualified immunity. *Id.* at \*11. We reasoned that the case was "not distinguishable from *Rogers*" because, as in *Rogers*, no reasonable person in the social workers' position could think that the infant would come to harm in the time it would have taken to obtain a warrant. *Id.* at \*9–\*10 (citing *Rogers*, 487 F.3d at 1294). That the infant in *Kirkpatrick* was removed from the hospital rather than from the home made no difference. *Id.* at \*9. If the infant's removal from her mother's custody without reason to believe that she faced an imminent risk of serious harm violated clearly established law in July 2008, then so did Dr. Wang's alleged detention of G.J. at the hospital in March 2010. *See id.* at \*9–\*10; *see also Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) (holding that "post-incident cases that make a determination regarding the state of the law at the time of the incident are persuasive authority").

Dr. Wang's primary argument on appeal is that this case falls in the interim period that occurs before a hospital hold can be issued because further investigation is necessary, rendering our precedent not clearly applicable. We agree that this case falls within this interim period, but we reject the contention that the constitutional standard clearly set forth in our precedent does not apply to this period. As the district court observed, it has been the clearly established law of this circuit for over a decade that a state official may not seize a child in the course of a child abuse investigation unless the official has "'reasonable cause to believe that the child is in imminent danger of serious bodily injury.'" *Mabe*, 237 F.3d at 1106–07 (quoting *Wallis*, 202 F.3d at 1138). Necessarily, then, our case law prohibits an official from detaining a child before the official develops a reasonable belief that a risk of serious harm is imminent. It follows from this clearly

established principle that an official may not detain a child merely in the hope that further investigation will turn up facts suggesting that exigent circumstances exist.

We next turn to whether this case is distinguishable from the general rule because Dr. Wang is a physician investigating child abuse rather than a social worker. Dr. Wang insists that because she is a physician investigating the cause of serious injuries sustained by an infant, the constitutional standard that we have applied to social workers is not clearly established with respect to her. Again, we disagree. "It is well-settled that the immunity to which a public official is entitled depends not on the official's title or agency, but on the nature of the function that the person was performing when taking the actions that provoked the lawsuit." *Id.* at 1106. The appropriate frame for our analysis therefore focuses on what Dr. Wang did, not her title or person.

Dr. Wang was investigating child abuse in her capacity as the medical director of the SCAN team. While Dr. Wang was indeed using her medical training to determine whether G.J.'s injuries were attributable to non-accidental causes, according to the Joneses' version of the facts, Dr. Wang's primary goal was not to treat or heal G.J. Rather, it was to investigate the nature and extent of G.J.'s injuries and whether they were caused by abuse. In detaining G.J. to confirm her suspicions, Dr. Wang was operating not as G.J.'s pediatrician but as the SCAN team medical director responsible for investigating abuse.

This case presents complex legal and factual issues. However, once the legal landscape is properly understood, the simplicity of the Joneses' claim underscores why the district

court did not err when it denied Dr. Wang summary judgment. We are cognizant of the Supreme Court's admonition that, "[w]hen properly applied, [the defense of qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It is clearly established law that a state actor may not remove a child from their parents' custody absent a court order or exigent circumstances. According to the Joneses, that is exactly what Dr. Wang did: she orchestrated G.J.'s hospitalization without sufficient evidence that G.J. was in imminent danger, implicitly coerced the Joneses to consent to that hospitalization, and ensured they could not remain alone with their child while Dr. Wang made the final decision whether to request a hospital hold. If the Joneses' version of events were believed, a rational juror could conclude that Dr. Wang knew she was violating the law. Dr. Wang knew she did not have sufficient evidence to detain G.J., yet a rational juror could find that she seized him anyway to further her investigation. The clear guidance our precedent provides to state officials investigating child abuse would put any reasonable state official in Dr. Wang's position on notice that such conduct violated G.J.'s and the Joneses' rights. Accordingly, because both prongs of the qualified immunity test were satisfied, the Joneses are entitled to attempt to prove their version of the facts to a jury and summary judgment was not appropriate.[9]

---

[9] We do not share our dissenting colleague's fear that our decision will interfere with social workers' and other state officials' efforts to protect children from abuse. *See* Dissent 39. If, in the future, a state-actor physician like Dr. Wang worries that discharging a child to his parents will result in serious and immediate harm, that physician should do what the Fourth and Fourteenth Amendments require—get a warrant to detain the child. Nor will our decision prevent a physician from ordering

## III.     State Statutory Privileges

We turn finally to Dr. Wang's asserted state statutory immunities to the Joneses' state-law claims.[10] We agree with the district court that Dr. Wang is not entitled as a matter of law to the reporter's privilege under section 11172(a) of the California Penal Code or discretionary immunity under section 820.2 of the California Government Code.

### Reporter's Privilege Under California Penal Code Section 11172(a)

Section 11172(a) of the California Penal Code provides absolute immunity to a mandatory reporter of child abuse and neglect, which includes physicians, against civil and criminal liability for a mandatory report of child abuse. *See* Cal. Penal Code § 11165.9, 11165.7(a)(21) (requiring reporting and including physicians among mandatory reporters). Under section 11172(a), the "reporter's privilege" extends to "conduct committed in furtherance of diagnosing whether abuse occurred," *Arce v. Cnty. of L.A.*, 150 Cal. Rptr. 3d 735, 765 (Ct. App. 2012), as well as "subsequent communications between the reporter and the public authorities responsible for investigating or prosecuting abuse," *Robbins v. Hamburger Home for Girls*, 38 Cal. Rptr. 2d 534, 538 (Ct. App. 1995). Here, however, Dr. Wang's challenged conduct occurred after

---

medically necessary tests or procedures for a child. In doing so, that physician need only be forthright and not misrepresent the nature of those tests or procedures in a way that interferes with the parents' ability to give knowing and voluntary consent.

[10] State-law immunities do not apply to federal constitutional claims brought under 42 U.S.C. § 1983. *Wallis*, 202 F.3d at 1144.

she reported G.J.'s case to DCFS. Viewing the facts in the light most favorable to the Joneses, her complained-of conduct usurped DCFS's authority under California law to take a child into temporary custody. *See id.* at 639 (explaining that the reporter's privilege does not extend to conduct that usurps the role of DCFS); *see also James W. v. Super. Ct.*, 21 Cal. Rptr. 2d 169, 254–57 (Ct. App. 1993) (holding that the privilege does not extend to unreasonable post-report investigation). Therefore, we affirm the district court's denial of Dr. Wang's motion for summary judgment on her immunity under the reporter's privilege.

## Discretionary Immunity Under California Government Code Section 820.2

Section 820.2 of the California Government Code grants public employees immunity from liability for the employee's acts or omissions during the employee's exercise of discretion invested in her. Discretion is vested in the employee when it is specifically assigned to the employee's agency by statute. *Newton v. Cnty. of Napa*, 266 Cal. Rptr. 682, 687 (Ct. App. 1990). Dr. Wang can point to no statute granting her discretion to admit a child into the hospital for the child's safety. Therefore, the district court properly denied Dr. Wang summary judgment on the grounds that she is immune from the Joneses' state law claims.

## Conclusion

We do not know whether a jury will find—and we express no opinion as to whether a jury should find—that Dr. Wang seized G.J. or that she did so absent exigent circumstances. Our task at this juncture is merely to determine whether, accepting the Joneses' version of the

facts, Dr. Wang violated the Joneses' clearly established rights of which any reasonable child-abuse investigator should have been aware. We conclude that, resolving all factual disputes in the Joneses' favor, the Joneses' version of the facts supports a claim that Dr. Wang seized G.J. from his parents without exigent circumstances, which would constitute a violation of the Joneses' clearly established constitutional rights. Therefore, at the summary judgment stage, Dr. Wang is not immune from suit.

**AFFIRMED.**

McNAMEE, District Judge, dissenting:

I find that Dr. Wang is entitled to qualified immunity because she did not violate either the Fourth Amendment or clearly established law. From *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), to *Taylor v. Barkes*, 135 S.Ct. 2042 (2015), the Supreme Court's direction has been consistent: particularized facts and legal standards—not generalized propositions of law—determine whether a state actor is entitled to qualified immunity. The Court has stressed that "when properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 131 S. Ct. at 2085 (internal quotations ommitted). Applying these principles to Dr. Wang's case, I cannot join the majority in denying qualified immunity to Dr. Wang, a respected physician, professor, and 23-year veteran of the UCLA Suspected Child Abuse and Neglect team whose actions were anything but malicious or incompetent.

I.  *Fourth Amendment Seizure*

The record before us does not support a finding that Dr. Wang violated the Joneses' constitutional rights. I disagree with the majority's reasoning on a number of grounds. First, the majority cobbles together multiple facts spanning over three days to find that Dr. Wang seized G.J.  However, as noted in the opinion, "[a] seizure is a single act, and not a continuous fact." *Hodari D.*, 499 U.S. at 625. I therefore disagree with the majority's analysis.

Second, the affirmative evidence does not show that the Joneses gave involuntary consent. Even if we were to assume that Dr. Wang seized G.J., a seizure of a child is reasonable where the official obtains parental consent. *James*, 606 F.3d at 652 n.2. "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. The only affirmative evidence "implying" that the Joneses did not give or maintain voluntary consent to G.J.'s hospitalization stems from communications and actions of third parties–nurses, police, and Rivas–to which no causal link implicating Dr. Wang has been drawn. In fact, the record shows that Dr. Wang unambiguously ordered that, without a hold issued by DCSF, the Joneses were not to be prevented from leaving with G.J. Further, the Joneses admit that Dr. Wang did not explicitly threaten G.J.'s detention. Therefore, as the affirmative evidence does not suggest that the Joneses gave involuntary consent, we cannot find that Dr. Wang violated the Joneses' Fourth Amendment rights. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that the moving party bears no duty to negate the opponent's claims).

Third, the majority improperly uses Dr. Wang's subjective intent. If, as the majority suggests, the relevant inquiry is whether the Joneses felt free to leave, then unknown facts to the Joneses, such as Dr. Wang's underlying intent in recommending hospitalization, are immaterial. *See Scott v. U.S.*, 436 U.S. 128, 138 (1978). Moreover, as the Fourth Amendment requires an objective analysis, it is dispositive that the Joneses have offered no evidence, expert testimony or otherwise, suggesting that Dr. Wang acted objectively unreasonably in recommending accelerated testing to address G.J.'s injuries. *Id.*; *Celotex Corp.*, 477 U.S. at 323. Accordingly, I find that Dr. Wang did not violate the Joneses' rights.

Turning now to exigency, deference must be given to Dr. Wang's findings of immediate harm. The majority argues that no exigency existed because Dr. Wang had not "concluded that G.J.'s rib fractures were the result of abuse." Op. at 20. However, our case law does not require a definitive diagnosis. *See Rogers*, 487 F.3d at 1294; *Mabe*, 237 F.3d at 1108 (holding that exigency requires a state actor to hold at least a "reasonable cause to believe" that a child would be seriously harmed in the time necessary to obtain a warrant). The record shows that Dr. Wang (along with Dr. Lauren Kim and Yolanda Johnson (DCFS supervisor)) found that G.J.'s newly-discovered injuries caused by his parents were "highly specific and concerning for non-accidental trauma" and believed that G.J. would be harmed if allowed to return home.

It is undisputed that the medical literature supports this finding.[1]   As it was only reasonable to assume that the Joneses would have taken G.J. from the hospital upon his release, Dr. Wang had "reasonable cause" to fear for G.J.'s immediate safety.[2] Accordingly, deference to Dr. Wang's finding of exigency is proper by mandate. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) (cautioning against "the 20/20

---

[1] The literature provides, in relevant part:

> Overall, a rib fracture for children under three years of age had a positive predictive value of 95% for the diagnosis of non-accidental trauma. After exclusion of children with a defined history of accident and/or disease, the positive predictive value for non-accidental trauma increased to 100%. Katherine Barsness M.D., et al. *The Positive Predictive Value of Rib Fractures as an Indicator of Nonaccidental Trauma in Children*, Journal of Trauma, Vol. 54, No. 6, June 2003, at 1107–10); *see also* Blake Bulloch, et al., *Cause and Clinical Characteristics of Rib Fractures in Infants*, Pediatrics, Vol. 105, No. 4, April 2000, at 1–5, (reporting that 82% of rib fractures in infants less than one year old were caused by child abuse); *and* Christine Chiaviello, et al., *Stairway-Related Injuries in Children*, Pediatrics, Vol. 94, No. 5, November 1994, at 679–81 (**reporting that severe head injury is compatible with stairway related fall, however injuries involving multiple body regions, or severe truncal or extremity injuries should prompt a search for an alternate mechanism including intentional trauma**)(emphasis added).

[2] Indeed, the likelihood of parents remaining in the hospital while officials seek to obtain a warrant is "cold comfort when the life of a newborn baby is at stake." *Kirkpatrick*, 2015 WL 415039 at *15 (Kozinski, J., dissenting).

vision of hindsight" in favor of deference to the judgment of reasonable state actors on the scene).

Overall, even when viewed in the Joneses' favor, the record does not suggest that Dr. Wang violated the Joneses' constitutional rights. In my opinion, G.J.'s progressing, textbook injuries suffered while in the exclusive custody of his parents gave Dr. Wang adequate evidence of child abuse and imminent harm to meet even higher levels of suspicion than that required by our case law. We should not now expose Dr. Wang to liability simply because she recommended further testing.

## II. *Clearly Established Law*

Even assuming that Dr. Wang violated the Joneses' constitutional rights, she is entitled to qualified immunity because (A) the facts of this case differ materially from our existing case law in 2010 and (B) the legal standards from the other Circuits are in disagreement.

## A. *Wallis, Mabe, Rogers*

Under the majority's holding, Dr. Wang would be exposed to liability because she recommended further hospital testing and monitoring for a nonverbal infant suffering from a complex depressed parietal skull fracture, an occipital skull fracture, extra axial bleeding, and bilateral posterior rib injuries. The majority does not dispute the medical literature, of which Dr. Wang was aware, confirming that these injuries were highly indicative of child abuse. Nor does it contest either Dr. Wang's or Michael Jones's conclusion that Jill Jones's March 5 explanation for G.J.'s injuries was inadequate. Nonetheless, the majority, citing

*Rogers*, 487 F.3d at, 1295–96,   and *Mabe*, 237 F.3d at 1106–07 (quoting *Wallis*, 202 F.3d at 1138), finds that there was no "imminent danger of serious bodily harm" to G.J.[3]

We must apply the test–or what the majority calls the "general rule"– announced in *Wallis* and adopted by *Mabe* and *Rogers* "in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198. The contextual similarities between Dr. Wang's investigation and our then-existing case law are therefore of paramount importance in determining whether Dr. Wang knew or should have known that her actions violated the constitution. *See Id*.

"Even a cursory glance at the facts," *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1776 (2015), from *Wallis*, *Mabe*, and *Rogers* confirms just how different those cases are from this one. This is not a case involving a social worker or a police officer. *Wallis*, 202 F.3d at 1131; *Mabe*, 237 F.3d at 1105; *Rogers*, 487 F.3d at 1291. This is not a case where home removal is at issue. *Id.* This is not a case where the injuries to the child were imagined, *Wallis*, 202 F.3d at 1131–32, specific to a certain time of day, *Mabe*, 237 F.3d at 1105, or mere signs of "child neglect", *Rogers*,

---

[3] To circumvent a portion of the qualified immunity analysis, the majority submits, while concurrently finding that "[t]his case presents complex legal and factual issues," that Dr. Wang "obviously" seized G.J. Op. at 25–26, 28–29. I oppose this argument based on my positions expressed in the previous section. I also highlight that the sitter placed in G.J.'s room did not materially change the Joneses' freedom to leave, as it is undisputed that Dr. Kim, the attending physician when the sitter was placed, held both the obligation and authority to discharge the Joneses, regardless of the sitter's presence. While this fact does not necessarily address whether the Joneses felt free to leave, it further confirms that the record does not sufficiently implicate Dr. Wang.

487 F.3d at 1291. Nor is this a case where the child was able to communicate. *Wallis*, 202 F.3d at 1131–32; *Mabe*, 237 F.3d at 1105; *Rogers*, 487 F.3d at 1291. In sum, "there is a world of difference," *Sheehan*, 135 S.Ct. at 1776, between a social worker removing young children without physical manifestations of abuse from their homes and Dr. Wang recommending hospital care to a nonverbal infant with textbook head and rib injuries suggesting serious child abuse. Given the unique situation presented in this case, a finding that "every reasonable official [in Dr. Wang's situation] would have understood that what he is doing violated" a constitutional right is simply unsupported. *Taylor*, 135 S.Ct. at 2044; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

## B. *Lack of Circuit Consensus*

"[T]o the extent that a robust consensus of cases of persuasive authority could itself clearly establish the federal right [alleged], no such consensus exists here. If anything, the opposite is true." *Sheehan*, 135 S. Ct. at 1778 (internal markings and citations ommitted); *see Gates v. Texas Dept. Of Protective and Regulatory Servs.* 537 F.3d 404, 428–29 (5th Cir. 2008) (discussing the various standards applied by the Circuits); *Gomes v. Wood*, 451 F.3d 1122, 1130 (10th Cir. 2006) (highlighting the broad disagreement concerning exigency in child abuse investigations); *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 21 (1st Cir. 2001) (calling *Wallis* the minority view). That the Circuits cannot agree over the correct legal standard further calls into question whether the Ninth Circuit's child abuse investigation law is "beyond debate." *al–Kidd*, 131 S.Ct. at 2083.

III.    *Conclusion*

The lack of affirmative facts implicating Dr. Wang, the distinct circumstances of this case, and the cornucopia of child abuse investigation standards lead me to find that Dr. Wang is entitled to qualified immunity. "Reasonable minds may disagree concerning the quantum of risk faced by [G.J.], but, under the circumstances, it was hardly malicious or 'plainly incompetent'" of Dr. Wang to recommend additional testing and monitoring. *Kirkpatrick*, 2015 WL 415039 at *16 (Kozinski, J., dissenting). I share Judge Kozinski's concern that "future babies will pay with their lives" due to the current trajectory of our qualified immunity case law. *Id*. I also fear that today's decision will encourage state officials, particularly investigating doctors, to forgo medically reasonable tests and procedures before making life-altering accusations. I therefore respectfully dissent from the majority's opinion.